**Santiago Herminio GONZALEZ y BARREDO, Plaintiff,**

v.

**Edelmira Folla SCHENCK, Individually and as Executrix of the Last Will and Testament of Maria Cintas Folla, Defendant.**

**No. 62 Civ. 3677.**

United States District Court
S. D. New York.

July 16, 1968.

---

10. See Ruderman v. United States, 355 F.2d 995 (2nd Cir. 1966).

11. See Ruderman v. United States, supra.

Harris L. Present and Arthur J. Galligan, New York City, for plaintiff.

Samuel N. Greenspoon, New York City, for defendant.

## MEMORANDUM

GRAVEN, Senior District Judge (by assignment).

The plaintiff is a citizen of Cuba. He formerly was a practicing lawyer in Havana, Cuba. In this action he asserts a claim for attorney fees alleged to be owing to him by Edelmira Folla Schenck, individually and as Executrix of the Estate of Maria Cintas Folla, deceased. She is a citizen of the State of New York. She will be referred to as the defendant. The amount in controversy, exclusive of interest and costs, is in excess of $10,000.00.

Oscar B. Cintas was a citizen and resident of Cuba. He had accumulated substantial wealth. He was quite prominent in Cuba. He was a well known collector of paintings. He had at one time served as Cuban Ambassador to the United States. He died in the City of Havana, Cuba, on May 11, 1957. His wife and parents had predeceased him. He left no children or descendants him surviving. His nearest surviving relative was a sister, Mrs. Maria Cintas Folla, who was then around seventy years of age. She was a citizen of Cuba but a long time permanent resident of New York City. Mrs. Folla's husband had predeceased her. They had only one child, Mrs. Edelmira Folla Schenck. She is a resident of New York City. She is the wife of Clyde L. Schenck. Mrs. Folla died testate in New York City on August 14, 1961. Mrs. Edelmira Folla Schenck was the sole beneficiary under her will and is the Executrix of her estate.

On October 7, 1953, Oscar B. Cintas executed a holographic will in the City of Havana which is referred to as the Cuban will. On April 30, 1957, while temporarily in New York City he executed another will referred to as the New York will. Mrs. Folla was not a beneficiary under either will. Mrs. Folla's daughter, Mrs. Schenck, was the beneficiary of a legacy of 25,000 pesos under the Cuban will. She was not a beneficiary under the New York will.

This controversy has its origin in a contingent fee agreement entered into on December 29, 1957, between the plaintiff and Mrs. Maria Cintas Folla having to do with the matter of her obtaining property which her brother owned at the time of his death. The background of that agreement will first be noted. The plaintiff was admitted to the bar of Cuba in 1944. He practiced law in the City of Havana from 1944 until September 19, 1961, when he became a political refugee. He has since resided in New York City.

Oscar B. Cintas' Cuban will contained numerous provisions. Many of those provisions related to specific legacies or devises. It named Luis Vidana as the Executor of his will. One of its provisions was as follows: "To Josefina Tarafa, the aunt of my Graziella (R. I. P.) everything in her name." The Graziella referred to in that provision was an aunt of the testator's deceased wife. The Cuban will also contained the following provision:

"After selling my things in New York intelligently and the money in the bank and also the securities and property of Panamanian Securities, and Corporation Mobiliaria Cintas, S. A. and after paying the taxes and expenses, what remains can be used for charitable purposes so that it benefits the *unfortunate*, no matter who,

and you shall distribute all the money bearing in mind high objectives and the indications I have given herein." (Emphasis supplied)

The "you" in that provision referred to the Executor.

The provisions of the will, apart from the two provisions just set out, were such as to leave a large amount of the testator's property subject to residuary disposition. Those two provisions gave rise to the question as to whether either of them constituted a valid disposition of the residuary property. No serious questions were ever raised as to the other provisions of the will and no question was ever raised as to the validity of the execution of the will.

The New York will was as follows:

"I, OSCAR B. CINTAS, a citizen of the Republic of Cuba and a resident of and domiciled in the Borough of Vadado, City of Havana, Republic of Cuba, do hereby make, publish and declare this as and for my Last Will and Testament but relating only to the disposition of such of my property and estate, real, personal or mixed, as is hereinafter referred to.

"*ONE*: I expressly declare that I elect, pursuant to the provisions of Section 47 of the Decedent Estate Law [McKinney's Consol.Laws, c. 13] of the State of New York that this Will and all the testamentary dispositions herein contained shall be construed and regulated by the laws of the State of New York, it being my intention that the validity and effect of such testamentary dispositions shall be determined by the laws of the State of New York. For this reason I request and direct my Executor to offer this Will for probate in the New York County Surrogate's Court (or such other Surrogate's Court as may have jurisdiction thereof), and I request the Surrogates of such Court to issue letters testamentary to my Executor.

"*TWO*: I give, devise and bequeath to a New York membership corpora-

tion in process of organization under the name Cuban Art Foundation, Inc., which name I request be changed to Cintas Foundation, Inc., all tangible personal property, paintings and other works of art owned by me or by any corporation of which I am the sole or substantially the sole stockholder (including without limitation, Mobilaria Cintas, S.A.) and located in New York City, all deposits in banks located in New York City, all my shares of stock of Punta Alegre Sugar Corporation, a Delaware corporation, regardless of whether registered in my name or the name of any corporation of which I am the sole or substantially the sole stockholder or in the name of any nominee or appointee of mine, and all shares of stock of Panamian [sic] Securities, Inc., a Panama corporation, and Mobilaria Cintas, S.A., owned by me.

"*THREE*: I appoint The Chase Manhattan Bank as Executor hereunder.

\* \* \* \* \* \*

"*FIVE*: I have heretofore made a holographic will and I direct that this Will shall be deemed to revoke my said holographic will only to the extent that this Will expressly disposes of property also disposed of by my holographic will, leaving my holographic will in full force and effect as to my other property.

\* \* \* \* \* \*

[Signature and Attestation]"

The Cuban Art Foundation, Inc., the sole beneficiary under the New York will, was incorporated under the laws of the State of New York on April 30, 1957. Its office was in New York City. The purposes of the Foundation, as set forth in its articles of incorporation, were as follows:

" '2. The purposes for which the Corporation is to be formed are to receive and apply funds exclusively for

educational purposes, namely, to foster and encourage art within the Republic of Cuba and art created by persons of Cuban citizenship or lineage within or outside the Republic of Cuba, and in furtherance of these purposes:

"(a) to solicit and collect funds and contributions, to receive by gift, deed, legacy, bequest or devise and otherwise to acquire money and property of every kind and description and to administer all the aforesaid property, both as to principal and income;

"(b) to apply such principal and income (i) to acquire and maintain works of art, (ii) without interest or other charges to loan or contribute funds and works of art, or otherwise provide assistance to, organizations operating art museums located in Cuba that are organized and operated exclusively for educational purposes, including any such organization which may own or operate an art museum in the former residence of Oscar B. Cintas located at D & 15th Streets, Borough of Vedado, Havana, Cuba, provided that if conditions in Cuba at any time or times are such as to make it in the opinion of the Board of Directors of the Corporation inadvisable to make contributions or loans of funds or works of art to any such organizations, then to apply such principal and income to the advancement of Cuban art elsewhere in the world and to loan works of art on a temporary basis to such other organizations in North, South or Central America that are organized and operated exclusively for educational purposes as the Board of Directors may deem appropriate, and (iii) to establish fellowships to be known as Cintas Fellowships for the encouragement of artists of Cuban citizenship or lineage to study art within or outside of the Republic of Cuba.' "

One Nunez, a resident of the City of Havana, was a cousin of Mrs. Folla. The reading of the Cuban will of Oscar B. Cintas was had on May 15, 1957. At the request of Nunez, the plaintiff attended that hearing. After hearing the will read he was of the view that it was defective in certain particulars. He was of the view that the two provisions in the will heretofore set forth did not properly or validly dispose of the residuary property and that the testator died intestate as to such property and that Mrs. Folla as his nearest relative and next of kin would be legally entitled to the residuary property as his universal heiress. He communicated his views to Nunez. On May 15, 1957, Nunez, in the presence of the plaintiff, placed a telephone call to the Schenck home in New York. Mrs. Schenck answered the call. Nunez suggested to her that her mother should employ the plaintiff to look after her interests. Nunez then put the plaintiff on the telephone and he discussed the matter with Mrs. Schenck. Mrs. Schenck then and frequently thereafter acted in behalf of her mother. On May 16, 1957, following his telephone discussion the plaintiff wrote a letter to Mrs. Schenck. In that letter he referred to the telephone conversation of May 15, 1957. In it he stated that Mrs. Schenck was given a legacy of 25,000 pesos under the will of Oscar B. Cintas and he thought it was necessary that he act in her name in connection therewith so that she "would not be defrauded." He further stated as follows:

"I should like to confirm to you what I stated in my telephone conversation. I am going to work in this matter in your name taking on and incurring all of the expenses involved during such time as the negotiation of the estate continues and until such time that each one of you comes into possession of what is supposed to correspond to you. At that time, I will receive compensation for these expenses and charge you my fees, and for this reason, I am

enclosing herewith a postal money order in your name in the amount of $50.00 in order to cover the expenses which might be incurred in the execution and granting of the powers of attorney from you and your mother." The powers of attorney were sent enabling the plaintiff to appear in the courts in Cuba in behalf of Mrs. Schenck and Mrs. Folla.

The New York will was filed for probate on or about May 25, 1957, as to which Mrs. Folla was informed. For some years prior Mrs. Folla had been acquainted with Nathaniel A. Devine, an attorney engaged in the practice of law in New York City. Mrs. Folla requested that he come and see her, which he did. She was concerned as to what her situation might be in connection with the New York will. Mr. Devine said he would make an investigation. His investigation disclosed that it was probable that it could be established that the testator had revoked the New York will and he so informed Mrs. Folla. He also informed her that if the New York will had been revoked all of the property constituting the decedent's New York estate would become intestate property and would pass to her as the decedent's nearest relative and next of kin. It was agreed between Mr. Devine and Mrs. Folla that he would be her attorney in connection with the New York estate. Mr. Devine had an office rather than a trial practice. He made it known to her that to carry on the litigation which would ensue it would be necessary for him to secure the assistance of a lawyer engaged in the trial practice and that he intended to have the assistance of Mr. Milton Pollack, a prominent and experienced trial lawyer. That proposed arrangement was satisfactory to Mrs. Folla. Mr. Devine and Mr. Pollack, in behalf of Mrs. Folla, promptly filed objections to admission to probate of the New York will on the ground it had been revoked.

The plaintiff was not and never has been admitted to the practice of law in the State of New York. Neither Mr. Devine nor Mr. Pollack was ever admitted to the practice of law in Cuba.

Mr. Devine and the plaintiff early learned of the employment of each other by Mrs. Folla. Thereafter, for a long period of time, they were in frequent communication.

In July, 1957, the plaintiff commenced a proceeding in a Court of First Instance in the City of Havana referred to as an ex parte proceeding in which it was asked that the Court declare that Mrs. Folla was the universal heiress of the decedent and as such was entitled to the residuary property. It developed that Josefina Tarafa was also asserting that she was the universal heiress under the provision of the will relating to her heretofore set out. It also developed that Luis Vidana, the Executor of the estate, was asserting that all of the residuary property of the decedent passed under the provision of the will heretofore set out relating to the "unfortunate". Soon after the probate of the Cuban will, Luis Vidana caused to be formed under the Cuban law a Foundation, "Succession of Oscar B. Cintas." That Foundation was apparently formed by Luis Vidana for the purpose of receiving and making distribution of the property purportedly provided for the relief of the "unfortunate".

Soon after the plaintiff had instituted the ex parte proceeding, Josefina Tarafa commenced a proceeding in a Court of the First Instance in Havana described as a voluntary testamentary proceeding asking that it be held that the residuary property passed to her under the provision of the will heretofore set out. In connection with her proceeding and upon her application, her attorney was appointed as Judicial Administrator of the estate. Luis Vidana proceeded to assert that the residuary property did not pass to either Josefina Tarafa or Mrs. Folla. As heretofore noted, it was his claim that the provision in the will providing for the "unfortunate" constituted

a valid disposition of the residuary property for the benefit of the "unfortunate".

The ex parte proceeding instituted by the plaintiff in behalf of Mrs. Folla was heard in the first instance by a Judge Nodarse. On July 16, 1957, he rendered his decision. He ruled that the ex parte proceeding was not the proper proceeding for the determination of her claimed rights. In his opinion he stated " * * * the said decedent with respect to the said Josefina Tarafa made a true and clear appointment of an heir with universal title * * *." The plaintiff asserts, and correctly so, that the statement of Judge Nodarse that Josefina Tarafa was the universal heiress of the decedent was purely dictum. Mrs. Folla appealed the decision of Judge Nodarse. However, so far as it appears the Cuban courts have at no time decided on the merits the question as to whether Josefina Tarafa or Mrs. Folla was the universal heiress of the decedent or whether the residuary property passed to either of them or to the "unfortunate".

Commencing in May, 1957, the relationship of attorney and client existed between Mr. Devine and Mrs. Folla and between the plaintiff and Mrs. Folla. For several months thereafter there was no definite agreement between her and either of them as to attorney fees. During that period the plaintiff was carrying on litigation in Cuba in behalf of Mrs. Folla, and Mr. Devine and Mr. Pollack were carrying on litigation in her behalf in New York. In connection with the matter of attorney fees, the nature and location of the property left by the decedent is one of pertinence. The decedent at the time of his death owned considerable real estate and a substantial amount of personal property situated in Cuba. He also owned a large amount of personal property either physically located in New York City or subject to the control and jurisdiction of the Surrogate's Court of New York County. That property is referred to as the New York estate. The other property is referred to as the Cuban estate. During his lifetime Oscar B. Cintas had collected many valuable paintings. At the time of his death some of the paintings were located in New York City and some in his home in Cuba. The gross value of the New York estate for inheritance tax purposes was around $7,000,000.00. Included in that estate were paintings having an appraised value of around $2,000,000.00. Because of subsequent developments, the value of the assets of the Cuban estate does not clearly appear. It does appear that such assets were of substantial value. Included in the assets of the Cuban estate were a number of paintings located in Cuba which had a substantial value.

Commencing in the fall of 1957 there were discussions between Mrs. Folla and Mr. Devine as to a contingent attorney fee agreement. The discussions largely centered around what his percentage of any recovery should be and whether that percentage should be applicable to the value of the paintings. Mrs. Folla was opposed to including the value of the paintings in the attorney's percentage. It was her expressed view that the paintings of her brother constituted a "sacred trust" and for that reason should not be included. He in his lifetime had expressed the desire that the paintings owned by him should be held for museum purposes. That is apparently what Mrs. Folla had in mind. Mr. Devine was opposed to the exclusion of the value of the paintings and, as hereafter appears, he prevailed.

In the latter part of December, 1957, the plaintiff came to New York City at the request of Mrs. Folla and over a period of several days had conferences with Mrs. Folla and Mrs. Schenck. Some of those conferences were attended by Mr. Schenck and some were attended by Mr. Devine. The plaintiff discussed with Mrs. Folla, Mrs. Schenck and Mr. Schenck the matter of an attorney contingent fee agreement. The discussion had to do with the percentage of the recovery to go to the plaintiff and whether or not the percentage would be applicable to the value of the paintings.

On December 29, 1957, the plaintiff drafted an agreement as to his compensa-

tion which was then signed by him and Mrs. Folla in New York City. The agreement is in Spanish. The translated agreement is next set forth:

"RIVEIRO Y GONZALEZ
LAWYERS

| Alejandro R. Riveiro Delgado | Santiago H. Gonzalez Barredo |
|---|---|
| Havana Bar Association No. 557 | Havana Bar Association No. 2607 |

Ayestaran No. 176
Havana, Cuba

Be it known by these presents that the party of the first part Dr. Santiago Herminio Gonzalez y Barredo, a lawyer, of legal age, married, a native of Havana, Cuban citizen and residing at number one hundred seventy-six Ayestaran Street between Desague and Diecinueve de Mayo in the city of Havana, Republic of Cuba, residing temporarily at the time of signing this instrument in the United States of America, at the Hotel Alamac, located at seventy-first street and Broadway; and the party of the second part, Mrs. Maria Amalia Raida de la Caridad Cintas y Rodriguez, a native of Sagua la Grande, Santa Clara Province, Republic of Cuba, a Cuban citizen, of legal age, a widow, at home, residing at Number three hundred seventeen West eighty-ninth Street (317 West 89th Street) in the city of New York, State of New York, United States of America, hereby agree to the following:

*FIRST:* By virtue of the fact that Mrs. Maria Amalia Raida de la Caridad Cintas y Rodriguez (referred to hereinafter as 'THE HEIRESS') considers herself with right to the inheritance of her brother, OSCAR BENJAMIN JOSE LORENZO RAMON CINTAS Y RODRIGUEZ, who died in the city of Havana, Cuba, on the eleventh day of May, one thousand nine hundred fifty-seven, has granted to Dr. Santiago Herminio Gonzalez y Barredo (referred to hereinafter as 'DR. GONZALEZ'), registered before the Notary of the Bar Association and District of Havana, Cuba, Dr. Bernardo Carames y Camacho, as per instrument number one hundred ninety-three dated June seventh, one thousand nine hundred fifty-seven, a power of attorney to represent and defend her, to the purpose that said attorney institute any necessary procedures or claims which may be necessary in order that 'THE HEIRESS' may come into possession of the estate of her aforesaid brother.

(s) Dr. Gonzalez.          (s) Cintas.

*SECOND:* By virtue of the fact that 'THE HEIRESS' does not posess [sic] at present adequate financial means to permit her to pay the legal or other expenses arising by reason of this suit, 'DR. GONZALEZ' agrees to pay any necessary expenses for this purpose, and to furnish his professional services as a Lawyer wherever necessary, and for whatever time may be necessary until the 'HEIRESS' comes into possession of the inheritance which belongs to her.

*THIRD:* In consideration of the provisions of the foregoing clauses, 'THE HEIRESS' agrees to pay to 'DR. GONZALEZ' a sum which represents twenty per cent of the value of the property awarded to her, up to the point that said twenty per cent attains the sum of five

hundred thousand dollars ($500,000.00) ; as soon as the compensation of 'DR. GONZALEZ' has reached the amount of five hundred thousand dollars, the percentage corresponding to him under this agreement shall be reduced to TEN PER CENT until the total sum to be received by 'DR. GONZALEZ' reaches one million dollars ($1,000,000 dollars), which sum is fixed as the maximum amount to be received by 'DR. GONZALEZ' as remuneration.  It is expressly agreed that the percentages referred to in this Clause are to be calculated on the net value of the inheritance which 'THE HEIRESS' may receive, that is, after deduction of any tax expenses it might be necessary to pay both in Cuba and in the United States of America, said payments to be supported exclusively by the official documents issued by the respective offices in each country.  Likewise, it is expressly agreed that from the value of the inheritance which may be awarded to 'THE HEIRESS', there shall be deducted the value of the works of art included in the estate, if the latter should be awarded to her, provided such works of art are made use of by 'THE HEIRESS' for exhibition in Museums in any part of the United States of America or of Cuba, or if the proceeds from the sale of same be donated to welfare or charity purposes, as may be verified to the satisfaction of 'DR. GONZALEZ'.

*FOURTH:* It is expressly agreed that this obligation is recognized under equal terms and purposes for those who might be the heirs of 'THE HEIRESS' in the event the latter should die before having paid to 'DR. GONZALEZ' the amount corresponding to him under this agreement, such heirs therefore being in the position and capacity of 'THE HEIRESS' for all purposes in this agreement.

By witness whereof, and signed in two copies of a single tenor and purpose in the City of New York on the twenty-ninth day of December, one thousand nine hundred fifty-seven.

   (s) Maria A. Cintas viuda de Folla      (s) Dr. S. Gonzalez"

On January 2, 1958, Mr. Devine and Mrs. Folla entered into an agreement prepared by the former.  The body of the agreement which was in the form of a letter from Mrs. Folla to him is next set forth:

"                                        January 2, 1958

Nathaniel A. Devine, Esq.

New York, New York

Dear Mr. Devine:

Re: *Estate of Oscar B. Cintas*

I am the sister of Oscar B. Cintas who died in Cuba on May 11, 1957. I am the sole intestate distributee of my brother who left property in both Cuba and New York—and possibly elsewhere.

Documents purporting to be the Will or Wills of my deceased brother have been or may hereafter be filed for probate and other proceedings may be commenced pertaining to his property.

You alone have given attention to my interests for over seven months in New York.  You have stated that it is now timely to obtain the association with you of distinguished counsel.

I hereby appoint and retain you as my attorney to represent me in all proceedings, no matter where initiated by others (but with the excep-

tion of Cuba where by legal representative is Santiago H. Gonzalez Barredo of Havana) which you may deem necessary to commence, to protect my interests and to take any and all steps that you may deem necessary or proper for the protection or advancement of my rights to or interest in the estate of my deceased brother and to retain and employ such other attorneys and persons as you may deem appropriate for such purposes.

As compensation for your services and for the services of such other attorneys (excepting Santiago H. Gonzalez Barredo of Havana who will be paid separately by me) as may be retained and employed by you, I agree that you shall be entitled to receive seventeen (17%) percent of the amount of all moneys and of the value of all property that may become payable to me or which I shall be entitled to receive from the estate of my deceased brother, or have the right to consent to the disposition of, after deduction of the amount of all estate or inheritance taxes payable therefrom, and disbursements paid or incurred on my behalf.

Sincerely yours,

/s/ Maria Cintas Rodriguez Viuda de Folla
_____
Maria Cintas y Rodriguez Viuda de Folla"

———◆———

It is to be noted that in the agreement between the plaintiff and Mrs. Folla the value of the "works of art" is excluded from the attorney's percentage but that no similar exclusion appears in the agreement between Mr. Devine and Mrs. Folla.

In the communications between the parties, Mr. Devine was referred to as Neil. On January 15, 1958, Mrs. Schenck wrote the plaintiff as follows: "As I explained to you in my previous letter, Niel [sic] already has the 'retainer'. He agreed upon 17% * * *." Under the date of January 20, 1958, the plaintiff wrote Mrs. Schenck: "I am quite satisfied with the arrangement which you have made with Niel [sic]. on the basis of 17% * * *." Subsequently the percentage in the Devine retainer agreement was by agreement of the parties increased from 17 percent to 20 percent.

The litigation in the Cuban and New York courts continued for several years. During that period the Chase Manhattan Bank was the duly appointed and acting Temporary Administrator of the New York estate.

In the fall of 1960 Mrs. Folla entered into agreements with the Cuban Art Foundation, Inc., and others under which she was to be paid the sum of $1,100,000.-00 payable from the assets of the New York estate. The settlement agreements were approved by the Surrogate's Court of New York County on February 6, 1961, and on March 6, 1961, the New York will was admitted to probate and the Chase Manhattan Bank qualified as the Executor of the New York estate. On or about July 31, 1961, Mrs. Folla was paid $5,000.00 of the $1,100,000.00. Mrs. Folla died testate in New York City on August 14, 1961. Edelmira Folla Schenck, her daughter referred to herein as Mrs. Schenck, was the sole beneficiary under the will and the Executrix of it. On or about June 30, 1962, the Chase Manhattan Bank, the Executor of the New York will of Oscar B. Cintas, paid to Mrs. Schenck as Executrix of Mrs. Folla's estate the sum of $1,095,-000.00. Mr. Pollack and Mr. Devine were paid out of that settlement $220,-000.00 for attorneys' fees, the same being 20 percent of $1,100,000.00, and the sum of $15,000.00 for expenses. Mrs. Schenck paid federal estate and state inheritance taxes on the amount of the settlement in the sum of approximately $124,000.00.

Mrs. Folla, under her agreement with Mr. Devine, became obligated to pay him 20 percent of the New York settlement, and, as above stated, he was paid that percentage in discharge of her obligation. The plaintiff in this action asserts the right to recover 20 percent of the same settlement. His claim is asserted against Mrs. Schenck individually and as the Executrix of her mother's estate. In the event that it be held that the plaintiff cannot recover under his contingent attorney fee agreement, he asks to recover for the fair and reasonable value of his professional services. The only witness testifying as to the value of those services testified they had a value of between $200,000.00 and $250,000.00.

It is the contention of the plaintiff that under the evidence the Court should make certain factual determinations. The factual determinations sought by the plaintiff are set forth in certain paragraphs of the Findings of Fact proposed by him. Those paragraphs are as follows:

"34. Plaintiff's legal activities in Cuba, on Maria Cintas Folla's behalf, were, in part, related to and of benefit to, the legal proceedings being conducted in the New York County Surrogate's Court in connection with Mrs. Folla's opposition to the probate of Oscar B. Cintas' New York Will.

"35. Plaintiff's legal activities in Cuba, rendered on behalf of Maria Cintas Folla and in connection with the assertion of her rights, under Cuban law, as residuary legatee and 'universal heiress' of Oscar B. Cintas, deceased, were of substantial benefit to Maria Cintas Folla and directly related to her ultimate ability to receive the sum of $1,100,000 from the estate of Oscar B. Cintas.

"36. When Maria Cintas Folla entered into the settlement agreements of September and October 1960, she thereby prevented plaintiff from further performing any services under his retainter [sic] agreement."

It is the contention of the defendant that the evidence is not such as to warrant the Court to make any of the proposed factual determinations. The defendant makes a number of other contentions which will be referred to later.

The plaintiff had certain opinions which are of pertinence. He at all times subsequent to the reading of the Cuban will was strongly of the opinion that under the Cuban law neither of the provisions of the Cuban will in favor of Josefina Tarafa and the "unfortunate" constituted a valid disposition of the residuary property and that as to that property the decedent died intestate and that it passed to Mrs. Folla as universal heiress. Because of subsequent developments, there was never any judicial determination on the merits by any Cuban court as to whether the plaintiff's opinion was or was not a correct construction of the Cuban will. Both before and after entering into the contingent attorney fee agreement with Mrs. Folla, he expressed certain other views to her. Those views are set forth in his pretrial deposition. In that deposition Mrs. Folla is referred to as Mrs. Cintas. In that deposition the following appears:

"Q Did you tell Mrs. Cintas in [sic] December 27, 1957, that all of the inheritance was subject to the laws of Cuba?

"A Yes. The jurisdiction of the laws of Cuba.

"Q What do you mean by the term 'jurisdiction of the laws of Cuba'?

"A That the inheritance of Oscar Cintas, it was governed by the laws of Cuba.

"Q Did you tell her, that is Maria Cintas, on December 27, 1957, that her legal situation in Cuba was solid?

"A Yes.

"Q Did you tell Mrs. Cintas in [sic] December 27, 1957, that her right to participate in the New York proceedings would cease if she was not declared heiress in Cuba?

"A Yes. If she were not declared heiress in Cuba, my opinion was that she will have no rights in anyplace else."

Commencing soon after his employment by Mrs. Folla, the plaintiff sought copies of documents connected with the New York litigation and was apparently concerning himself with that litigation. He was early, promptly and firmly informed by Mr. Devine that the validity of the New York will and the right of Mrs. Folla to the New York property were matters as to which the New York law was applicable and as to which the New York courts had assumed jurisdiction and that the law of Cuba had nothing to do with those matters. The plaintiff throughout continued to adhere to the views heretofore set out from his pretrial deposition.

The Surrogate's Court of New York County assumed jurisdiction of the New York will and as to the rights of Mrs. Folla in and to the New York property and took control of and assumed jurisdiction over that property. Thus, it developed that the plaintiff was mistaken in his views as to the extraterritorial effect of the Cuban litigation. The right of Mrs. Folla in and to the New York property was not governed by the law of Cuba or dependent upon her being adjudged to be the universal heiress in the Cuban proceedings.

At no time did either the Chase Manhattan Bank or the Cuban Art Foundation become a party to any of the proceedings in the Cuban courts.

The New York litigation relating to the will of Oscar B. Cintas and the New York property became very extensive. Various Cuban parties sought to intervene. An unsuccessful attempt was made by Cuban parties to have the Surrogate's Court of New York County grant ancillary letters of administration as to the Cuban will. The discovery proceedings were lengthy. There were innumerable contested motions and applications.

It was heretofore noted that in July, 1957, the plaintiff commenced litigation in the Cuban courts seeking to establish Mrs. Folla's right to the residuary property in the Cuban estate and that Josefina Tarafa and Luis Vidana were also each asserting a right to that property. The validity of the Cuban will of Oscar B. Cintas was not at any time questioned. The litigation had only to do with the matter of the passing of the residuary property.

The Cuban litigation became a procedural morass. Month after month, year after year, the litigation continued as to matters of proper remedies, proper parties, jurisdiction as between Courts of the First Instance and other innumerable procedural matters. In connection with the Cuban litigation there were repeated appeals to intermediate appellate courts and to the Supreme Court of Cuba. The chronology of the Cuban litigation prepared by the plaintiff contains 103 entries.

In January, 1959, while the litigation as to procedural matters was still going on, the Castro Regime took over. Soon after that Regime took over, the summary removal of a number of judges took place. That Regime instituted the policy of confiscating the property of those who had been connected with former regimes. Oscar B. Cintas had been the Cuban Ambassador to the United States under a former regime.

Mrs. Folla for a number of years prior to the time in question had been receiving a small Cuban civil pension. Following the advent of the Castro Regime, the Cuban Government would not allow remittances of that pension to be made to her. It was heretofore noted that Mrs. Schenck was given a legacy of 25,000 pesos under the Cuban will about which there was no question. The plaintiff at the time of his employment by Mrs. Folla was also employed by Mrs. Schenck to secure for her the payment of that legacy. She repeatedly urged the plaintiff to secure payment of her legacy. Although there has never been any dispute as to that legacy, the plaintiff was never able to secure the payment thereof. It has never been paid.

Early in 1960 Mrs. Folla began to despair of ever securing anything by the Cuban litigation. Her civil pension could

not be sent to her. Mrs. Schenck could not secure payment of the legacy provided for her in the Cuban will about which there was no dispute. The Cuban litigation had been going on for more than two and one-half years and no judicial determination on the merits of her claim had been reached; there was suspicion of corruption on the part of some of the Cuban judges having to do with the litigation; and there was suspicion on her part that the estate in Cuba was being looted.

The New York litigation was proving to be very burdensome and expensive. By discovery proceedings the attorneys for Mrs. Folla had brought out matters which lent support to her claim that the New York will had been validly revoked. The discovery proceedings disclosed little evidentiary support for the claim of the other objectors that the New York will had been invalidly executed. The only serious question was as to whether it had been validly revoked. Commencing in the latter part of 1959 there were indications that the Cuban Art Foundation, the sole beneficiary under the New York will, might be willing to consider a settlement. On February 9, 1960, after such indications had been made but long before any settlement arrangements were entered into, Mrs. Folla and the plaintiff had a telephone conversation. In it she told him to withdraw the Cuban litigation. She also inferred that there was a possibility of a settlement with the Cuban Art Foundation. She wanted to know what his charges would be. He told her, in substance, that his fees would be as provided in his agreement. It appears from some later correspondence that the plaintiff may have misunderstood his conversation with her. At any rate, as just hereafter noted, he continued with the litigation.

In a chronology of the Cuban litigation prepared by the plaintiff, there appears the following entry: "On April 19, 1960 the Appeal was argued by Gonzalez and others * * * and, on May 11, 1960 the Court rendered its decision denying the appeal * * *." The Appeal re-

ferred to was an appeal to an intermediate appellate court.

On October 9, 1960, Mrs. Folla wrote the plaintiff, in part, as follows:

"In effect, I do not want to continue the litigation in the matter of my brother Oscar * * *. Niel [Mr. Devine] has been told this by me on several occasions and now I tell it to you so that you will stop all of your activity in Cuba representing me in connection with the matter of my brother Oscar * * *. I have been greatly deceived and I have many other reasons. * * *"

In response thereto the plaintiff on November 3, 1960, wrote Mrs. Folla, in part, as follows: "In accordance with what you state therein I have been able to understand that it is not your desire to renounce your brother Oscar's estate * * * but only to come to an agreement with the rest of the parties in this litigation." In the letter he requested information as to the terms of the proposed settlement. In response to that letter Mrs. Folla on November 7, 1960, wrote the plaintiff, in part, as follows:

"When I wrote you asking you to stop all activity in Cuba in connection with the litigation I did not complete my thought and to clarify it was because I wanted to come to an arrangement here and it is necessary to withdraw all proceedings here and there in order to be able to arrive at a settlement. The settlement is being negotiated and I do not know how long it will take. It is necessary to wait. It is only here where it might have been possible to come to any settlement because you know that the Courts in Cuba will not give me anything or recognize me as of the precise moment in which [Judge] Nodarse made 'his decision'. I do not want to continue with such headaches in this litigation. It depresses me and makes me sick * * *."

The plaintiff did not discontinue his activities in connection with the Cuban litigation. In the answers to interroga-

tories propounded to him by the defendant, he set forth the time spent by him in connection with the Cuban litigation. The following appears therein:

"From Wednesday, July 27, 1960, to and *including Wednesday December 21 1960* ...................................46 hours.

2 hrs. each Wednesday, attendance at Court of First Instance, Eastern and Northern Districts of Havana, checking the records in Plenary Proceeding, and of Voluntary Testamentary Action.

From Tuesday, January 10, 1961, to and *including Tuesday, September 19, 1961* ...................................74 hours

2 hrs. each Tuesday, attendance at Court of First Instance of Eastern and Northern Districts of Havana, checking the records in Plenary Proceeding and of Voluntary Testamentary Action."

———◆———

The plaintiff, as heretofore noted, fled Cuba on September 19, 1961.

It was heretofore noted that a number of Cuban parties sought to become parties to the New York litigation. The Surrogate's Court of New York County denied the application of Luis Vidana in his capacity as Executor of the Cuban will to become a party. He was permitted to become a party acting in behalf of the Foundation, "Succession of Oscar B. Cintas." That Court permitted Josefina Tarafa to become a party. Upon becoming parties, Josefina Tarafa and Luis Vidana made objections to the probate of the New York will on the grounds of fraud and undue influence and revocation.

During the pendency of the New York litigation the Chase Manhattan Bank was acting as Temporary Administrator. While still so acting it made application to the Surrogate's Court of New York County to allow the New York paintings to be placed in the National Museum of Arts in Havana to be held there pending a judicial determination of their ownership. The Cuban Arts Foundation, the sole legatee under the New York will, was authorized by its articles of incorporation to loan works of art to and help maintain organizations operating art museums located in Cuba. The Foundation was apparently willing that such loan

be made. The application was successfully resisted by Mrs. Folla. Subsequently the Cuban Government, under what is described as a loan arrangement, came into possession of the Cuban paintings and placed them in the National Museum of Arts in Havana.

In the latter part of 1960 settlement negotiations with the Cuban Art Foundation were under way. The Cuban Art Foundation was desirous of having the New York will admitted to probate under which it would receive all of the New York property. That property, as heretofore noted, included part of the paintings collected by Oscar B. Cintas. The Foundation was also desirous of acquiring that part of the collection which was located in Cuba. By so doing, it would have ownership of the entire collection. The situation was such that any money paid to Mrs. Folla and others by way of settlement would have to be paid out of the assets of the New York estate. The situation also was that the paintings in Cuba were a part of the residuary property in the Cuban estate to which conflicting claims had been made by Mrs. Folla, Luis Vidana acting for the Foundation, "Succession of Oscar B. Cintas," and Josefina Tarafa.

On September 29, 1960, an agreement was executed by the Cuban Art Foundation, Mrs. Folla, Josefina Tarafa and Luis Vidana. On September 29, 1960,

another agreement was executed between the Cuban Art Foundation and Luis Vidana. On October 24, 1960, another agreement was entered into between the Cuban Art Foundation and Mrs. Folla.

The three agreements provided for the settlement of the New York litigation by Mrs. Folla, Josefina Tarafa and Luis Vidana withdrawing their objections to the probate of the New York will and for the Cuban Art Foundation becoming the owner of the Cuban paintings. One of the September 29, 1960, agreements recited that the paintings "have been delivered at National Museum, Havana, Cuba; and Cuban Art Foundation hereby accepts delivery at said Museum." In one of the September 29, 1960, agreements it was provided that the following payments should be made from the New York estate: the sum of $500,000.00 to Maria Cintas [Folla]; the sum of $100,000.00 to Josefina Tarafa; and the sum of $150,000.00 to Luis Vidana. The agreement of October 24, 1960, between the Cuban Art Foundation and Mrs. Folla recited, in part, as follows:

"WHEREAS, the CUBAN ART FOUNDATION, INC. desiring to acquire the additional paintings and works of art which the decedent left as a part of the Cuban Estate, purchased said paintings and works of art pursuant to an agreement made as of September 29, 1960, giving as its consideration for such purchase an agreement to pay MARIA CINTAS [Folla] the amount of $600,000.00 to obtain from her a release of all her rights and claims in and to the Cuban Estate; and

"WHEREAS, MARIA CINTAS [Folla] is willing to give such a release provided her right to receive $600,000.00 is adequately secured by an agreement whereby CUBAN ART FOUNDATION, INC. assigns to her, by way of a first charge upon, its interest in the property which CUBAN ART FOUNDATION, INC. is entitled to receive from the New York Estate to the extent of $600,000.00."

The agreement provided that Mrs. Folla "agrees to deliver a release of all her right, title and interest which she now has or any claims which she now has or may hereafter acquire in and to the Cuban Estate * * *."

On February 6, 1961, the Surrogate's Court of New York County approved the settlement. All objections to the probate of the New York will were withdrawn and on that date the will was admitted to probate. On March 6, 1961, the Chase Manhattan Bank qualified as Executor of the New York will.

The New York settlement under which Mrs. Folla renounced or abandoned any claim to the Cuban property became effective upon its approval by the Surrogate's Court of New York County on February 6, 1961. Neither Mrs. Folla nor anyone else acting in her behalf notified the plaintiff of the consummation of the settlement. He first learned of the settlement in 1962 in New York City. The plaintiff was active in the Cuban litigation until he fled Cuba on September 19, 1961. Nothing appears as to what happened to the Cuban litigation thereafter. It was heretofore noted that during the course of the Cuban litigation the paintings located in Cuba came into the possession of the Cuban Government. A witness, who was an attorney for the Chase Manhattan Bank during the New York litigation, testified that the assets of the Cuban estate were seized by the Cuban Government.

On November 7, 1962, the plaintiff commenced this action. In his complaint he declared on his attorney fee agreement of December 29, 1957, and sought thereunder to recover 20 percent of the $1,100,000.00 settlement. In the Pretrial Order it is specified that in the event he cannot recover on that agreement he asks for the fair and reasonable value of his professional services. It was heretofore noted that the only witness testifying to the value of those services testified that they were of the value of between $200,000.00 and $250,000.00.

Under paragraph 34 of the plaintiff's proposed Findings of Fact heretofore set forth, it is the theory of the plaintiff that he is entitled to recover because his legal activities were "related to and of benefit to" the legal proceedings being conducted by Mrs. Folla in New York in opposition to the probate of the New York will. In paragraph 35 of the plaintiff's proposed Findings heretofore set forth, it is the theory of the plaintiff that his legal activities in Cuba were of substantial benefit to Mrs. Folla and "directly related to her ultimate ability to receive the sum of $1,100,000 from the estate of Oscar B. Cintas." The two theories are closely related. However, in substance, they would seem to be that the settlement of $1,100,000.00 was, in part, the fruit of the plaintiff's activities.

In order for Mrs. Folla to succeed in the New York litigation, it was first necessary that the Surrogate's Court of New York County assume jurisdiction as to the New York will and assume control over and jurisdiction of the property of the decedent located in New York. It did so do. Upon the Court so doing, Mrs. Folla's right to recover the New York property had to be and was based upon the claim that under the New York law the decedent had legally revoked the will executed by him in New York City. It was the possibility of that will being held to have been revoked which threatened the status of the Cuban Art Foundation as the sole beneficiary thereunder. That possibility caused it to enter into settlement negotiations and effect a settlement under which the will would be admitted to probate and the New York property pass to it.

It does not appear that the plaintiff's activities had anything to do with the Surrogate's Court of New York County assuming jurisdiction as to the will and the New York property of the decedent. The plaintiff, in fact, was of the view that the jurisdiction as to the entire estate was in the Cuban courts. It does not appear that the plaintiff had anything to do with the preparation of the case in connection with the revocation of the will, upon which revocation Mrs. Folla's right of recovery had to rest. The plaintiff had no part in the negotiations for the settlement or in the carrying out of the provisions thereof.

The plaintiff has failed to establish that the $1,100,000.00 settlement was either induced, produced or in any way brought about by his activities or that the settlement was in any way the fruit of his activities.

The settlement was a package settlement. As an integral part of that settlement the Cuban Art Foundation acquired the ownership of the Cuban paintings then in the National Museum of Arts in Havana, Cuba. The settlement figure of $1,100,000.00 included $600,000.00 to be paid for the Cuban paintings, which amount was to be paid from the assets of the New York estate. The plaintiff had nothing to do with that transaction. Further, his contingent attorney fee agreement expressly excluded the value of the works of art included in the estate.

The plaintiff contends that he performed all of the terms and conditions on his part to be performed under his agreement with Mrs. Folla, yet she by her activities prevented him from securing the fruits of the Cuban litigation and therefore he is entitled to recover either the contractual sum of $220,000.00 or the fair and reasonable value of his services. This contention requires consideration of a number of closely related matters. Before Mrs. Folla had entered into any settlement arrangements with the Cuban Art Foundation, she had become convinced that the Cuban litigation had become hopeless and fruitless. She desired to discontinue and abandon that litigation. She made her desire known to the plaintiff. He did not discontinue the litigation. He did not cease his efforts in connection therewith until he fled Cuba on September 19, 1961. However, as a matter of fact, Mrs. Folla legally terminated that litigation so far as she was concerned on February 6, 1961, upon the approval

of the New York settlement by the Surrogate's Court of New York County, in which settlement she renounced or abandoned any claim to the Cuban property.

More than a year prior to the approval of the New York settlement the situation was as next set forth. The Cuban litigation had been going on for around three years. The litigation had become so bogged down that no hearing on the merits of Mrs. Folla's claim had been had or appeared likely to be had. Further, in January, 1959, the Castro Regime had taken over in Cuba. Following the advent of that Regime it soon became manifest that it was not going to allow any funds to be transferred or paid to non-residents. The payment of Mrs. Folla's civil pension was stopped. Mrs. Schenck had been unable to secure payment to her of the legacy to which she was indisputably entitled under the Cuban will.

The course of the litigation had shown Mrs. Folla that some of her Cuban adversaries were determinedly trying to defeat or frustrate her efforts to recover the Cuban residuary property and, to state it realistically, that the Cuban courts had proved to be a judicial quagmire insofar as her claim to the residuary property was concerned. It did not appear that there was any reasonable likelihood of her claim ever being successfully extricated from that quagmire or of ever securing the benefit of the residuary property.

There inheres in the theory of the plaintiff that, except for the termination of Mrs. Folla of the Cuban litigation by the settlement agreement which became effective on February 6, 1961, the Cuban litigation could have been carried on to success and that Mrs. Folla would have obtained the Cuban residuary property or its proceeds. The litigation was, in fact, carried on until it was abandoned by the plaintiff by his flight on September 19, 1961.

To say that at any time after early 1960 or at any time thereafter there was any reasonable likelihood of Mrs. Folla being able to carry on the Cuban litigation to a successful conclusion and to obtain the Cuban property or its proceeds would be to depart from reality and to indulge in mere wishful thinking.

The directions given by Mrs. Folla to the plaintiff to discontinue the Cuban litigation and the subsequent renunciation by her of her claim in the New York settlement agreement did not frustrate her agreement with the plaintiff. The frustration of that agreement had already occurred. The actions of Mrs. Folla referred to merely constituted a recognition and realization on her part that frustration had occurred.

The Court is of the view and finds that the object and purpose of the contingent attorney fee agreement had become frustrated by the Cuban courts and the Castro Regime before any settlement was consummated by Mrs. Folla. That frustration was occasioned by happenings and events for which Mrs. Folla was not responsible. The contention of the plaintiff that Mrs. Folla prevented him from obtaining the benefit of the fruits of the Cuban litigation is not well founded. In that connection it is to be noted that the plaintiff seeks to apply the contractual percentage against the proceeds of the New York settlement which, as heretofore noted, were not in any way produced, induced or brought about by any activities on the part of the plaintiff rather than to apply that percentage against the expected fruits of the Cuban litigation. It seems clear, and the Court so holds, that the plaintiff cannot recover the contractual percentage sought by him. The question as to whether he can recover for the reasonable value of his services in connection with the Cuban litigation will be referred to later.

The defendant, in addition to contending that the plaintiff is not entitled to recover on any of the theories urged by him, makes certain other contentions. Those contentions are contained in certain Findings of Fact pro-

posed by her. The defendant's proposed Finding Number 57 is, in part, as follows: "The written retainer dated December 29, 1957 was the result of overreaching by the plaintiff of his client, Mrs. Folla, and the terms thereof are unconscionable * * *."

The contingent attorney fee agreement between the plaintiff and Mrs. Folla provided for him being paid 20 percent of the recovery with the value of the paintings excluded from the percentage. It is to be noted that Mrs. Folla's contingent attorney fee agreement with the plaintiff was more favorable to her in this respect than was her contingent attorney fee agreement with Mr. Devine.

The Court is of the view that the contingent attorney fee agreement between Mrs. Folla and the plaintiff was not the result of overreaching on the part of the plaintiff and the terms thereof were not unconscionable.

The defendant also makes the contentions set forth in her proposed Finding of Fact Number 59. That proposed Finding is, in part, as follows: "The written retainer involved herein was entered into on the basis of mutual mistake of law and fact or was obtained from Mrs. Folla by plaintiff through fraud and misrepresentation * * *."

The contentions set forth in the defendant's proposed Finding Number 59 are closely related. They are based, in part, upon the statement made by the plaintiff to Mrs. Folla that her claim to the residuary property of the Cuban estate was solid and upon the statement made by him that her right to the property of the decedent elsewhere than Cuba was dependent upon her being held to be the universal heiress of her brother by the Cuban courts. Those statements were made prior to the execution of the attorney fee agreement. Since it would be highly unlikely that the plaintiff or any other lawyer would guarantee the successful outcome of litigation, it would seem that the reasonable interpretation of the plaintiff's statement as to her claim being a solid claim would be that

he regarded her claim as being a valid and meritorious one under the Cuban law which presumably would be held to be such by the Cuban courts. Because of subsequent developments, the question as to whether Mrs. Folla did or did not have a valid and meritorious claim to the residuary property of the Cuban estate has never been determined.

The vicissitudes of litigation being what they are, there are doubtless numerous instances where an attorney in connection with his employment on a contingent fee basis expresses to the client his belief that his or her claim is meritorious but recovery on the claim is not subsequently achieved. In such an instance the expression of the belief would hardly be regarded as constituting a false representation. Neither could the attorney fee agreement involved be ordinarily regarded as being based on mutual mistake.

The willingness of the plaintiff to devote his time and efforts to the prosecution of Mrs. Folla's claim on a contingent fee basis and the payment of the expenses connected therewith clearly manifested that in good faith he believed that Mrs. Folla had a valid and meritorious claim to the residuary property of the Cuban estate.

The contention of the defendant that the statement of the plaintiff that he regarded Mrs. Folla's claim to the residuary property of the Cuban estate as solid constituted a false representation is not well founded. The same is true of her related contention that because of that feature the agreement was based upon a mutual mistake.

The contention of the defendant that the agreement was obtained from Mrs. Folla through fraud and misrepresentation is based, in part, upon the statement made by the plaintiff in which he expressed the view that the rights of Mrs. Folla elsewhere in and to her brother's property were dependent upon her being declared her brother's universal heiress by the Cuban courts. The plaintiff's opinion and view as to that matter was based upon the fact that the

decedent was a citizen and permanent resident of Cuba; that the New York will was executed by him while only temporarily in New York; and that Mrs. Folla was a citizen of Cuba.

If the Surrogate's Court of New York County had, as it was urged to do, declined jurisdiction as to the New York will and the New York property in favor of the Cuban courts, then obviously Mrs. Folla's rights in and to any of the property owned by the decedent at the time of his death would depend upon the status given her by the Cuban courts. However, as heretofore noted, the Surrogate's Court of New York County did assume jurisdiction as to the New York will and did assume jurisdiction over and control of the property of the decedent located in New York. After that occurred the question as to whether Mrs. Folla's rights in New York were in any way dependent upon her status as universal heiress in Cuba became of no consequence. However, the plaintiff continued to adhere to the belief that because of Mrs. Folla's being a citizen of Cuba her status in Cuba as determined by the Cuban courts was of consequence in the New York litigation. The plaintiff's opinion that Mrs. Folla's rights in and to the New York property were dependent upon her being held to be her brother's universal heiress under the Cuban law was a mistaken opinion. However, he believed that such was the law.

■ The mere fact that an attorney agreeing to undertake litigation on behalf of a client expresses an opinion on a matter of law, which opinion is not upheld by the courts, obviously does not make him guilty of having made a false representation. If he believes his opinion was correct, it is the case of a mistaken opinion rather than a false representation. In the present case the plaintiff believed and apparently still believes that his opinion was correct. What jurisdiction a particular court may exercise in a case depends upon what jurisdiction it chooses to exercise. Common law concepts as to jurisdiction are not necessarily the same as civil law concepts. The contention of the defendant that the plaintiff's statement as to the law last referred to constituted a false representation is not well founded. The same is true of her related contention that because of that feature the agreement was based upon a mutual mistake.

It was heretofore noted that the opinion just discussed was expressed by the plaintiff to Mrs. Folla in New York City in connection with and prior to the execution of the contingent attorney fee agreement. It was also expressed by him during the course of the Cuban litigation. It is the contention of the defendant that in giving it as his opinion that her rights to the New York property were dependent upon her being held to be her brother's universal heiress by the Cuban courts the plaintiff engaged in the practice of New York law and, therefore, cannot recover herein. The contentions of the defendant in that connection are set forth in her proposed Finding of Fact Number 60. That paragraph is as follows:

"60. The plaintiff practiced law and gave legal advice in contravention of the law and public policy of New York and any retainer of the plaintiff was procured in the course of the illegal practice of law and is void and unenforceable and all services claimed to be performed thereunder are non-compensable."

In this connection the defendant strongly relies upon the leading New York case of Spivak v. Sachs (1965), 16 N.Y.2d 163, 263 N.Y.S.2d 953, 211 N.E.2d 329. That case was a suit brought in New York by a California lawyer not admitted to practice in New York against Mrs. Sachs, a resident of New York, to recover the reasonable value of attorney services rendered by him to her. Mrs. Sachs' husband had instituted divorce proceedings against her in Connecticut. She employed Connecticut and New York lawyers. She later became troubled and confused about the matter of property settlement and child custody. She and her husband had met the plaintiff

socially. She telephoned to the plaintiff in California and asked him to come to New York and talk with her about her affairs. He came to New York and spent about fourteen days there. While there he examined various drafts of proposed separation agreements and discussed problems as to financial arrangements and child custody. He conferred with Mrs. Sachs' New York attorney and told him that Connecticut was not a court of proper jurisdiction. Later when he brought an action to recover from Mrs. Sachs for the reasonable value of his services she asserted the defense that the services rendered by him constituted the illegal practice of New York law in violation of Section 270 of the New York Penal Law, McKinney's Consol. Laws, c. 40. That Section is, in part, as follows:

"§ 270. Practicing or appearing as attorney-at-law without being admitted and registered

"It shall be unlawful for any natural person to practice or appear as an attorney-at-law or as attorney and counselor-at-law for a person other than himself in a court of record in this state or in any court in the city of New York, or to furnish attorneys or counsel or an attorney and counsel to render legal services, or to hold himself out to the public as being entitled to practice law as aforesaid, or in any other manner, or to assume to be an attorney or counselor-at-law, or to assume, use, or advertise the title of lawyer, or attorney and counselor-at-law, or attorney-at-law or counselor-at-law, or attorney, or counselor, or attorney and counselor, or equivalent terms in any language, in such manner as to convey the impression that he is a legal practitioner of law or in any manner to advertise that he either alone or together with any other persons or person has, owns, conducts or maintains a law office or law and collection office, or office of any kind for the practice of law, without having first been duly and regularly licensed and admitted to practice law in the courts of record of this state, and without having taken the constitutional oath and without having subscribed and taken the oath or affirmation required by section four hundred and sixty-eight of the judiciary law and filed the same in the office of the clerk of the court of appeals as required by said section. * * *"

The Trial Term and the Appellate Division had decided that what the plaintiff did in New York did not constitute the "practice of law" within the meaning of Section 270. The Court of Appeals in a 4 to 3 decision reversed and held the plaintiff could not recover. It stated (211 N.E.2d p. 331):

"* * * Here we have a California lawyer brought to New York not for a conference or to look over a document but to advise directly with a New York resident as to most important marital rights and problems. Not only did he give her legal counsel as to those matters but essayed to give his opinion as to New York's being the proper jurisdiction for litigation concerning the marital res and as to related alimony and custody issues, and even went so far as to urge a change in New York counsel. To say that this falls short of the 'practice of law' in New York is to defeat section 270 and the policy it represents. The statute aims to protect our citizens against the dangers of legal representation and advice given by persons not trained, examined and licensed for such work, whether they be laymen or lawyers from other jurisdictions.

"* * *

"There is, of course, a danger that section 270 could under other circumstances be stretched to outlaw customary and innocuous practices. We agree with the Supreme Court of New Jersey (Appell v. Reiner, 43 N.J. 313, 204 A.2d 146) that, recognizing the numerous multi-State transactions and relationships of modern times, we cannot penalize every instance in

which an attorney from another State comes into our State for conferences or negotiations relating to a New York client and a transaction somehow tied to New York. * * *

"This was an illegal transaction and under our settled rules we refuse to aid in it but leave the parties where they are * * *."

■■ The facts in this case differ from the facts in the case of Spivak v. Sachs, supra. In that case Mrs. Sachs was not conducting any litigation in California which had to do with her problems. In that case the services for which recovery was sought were rendered in the State of New York and involved the giving of a large amount of legal advice covering many phases. In the present case litigation was under way in both New York and Cuba concerning the claims of Mrs. Folla to property owned by her brother at the time of his death. The plaintiff expressed the view that the litigation in Cuba could affect her status as to the New York property. In expressing that view, the plaintiff was giving his legal opinion as to the extra-territorial effect of the Cuban litigation which he was then handling. It would seem that the expressing of an opinion by an attorney as to the extraterritorial effect of local litigation he is then handling could hardly be regarded as engaging in the practice of law in the extraterritorial jurisdiction. It is the view of the Court that the contention of the defendant that the retainer of the plaintiff was procured in the course of the illegal practice of New York law is not well founded.

The defendant makes another contention. That contention is based upon the provision in the contingent fee agreement which provides that the plaintiff agrees "to pay the legal or other expenses" arising in connection with the litigation. The defendant asserts that under Section 274 of the New York Penal Law the agreement was illegal as a champertous agreement. That Section provides, in part, as follows:

"An attorney or counselor shall not: * * *

"2. By himself, or by or in the name of another person, either before or after action brought, promise or give, or procure to be promised or given, a valuable consideration to any person, as an inducement to placing, or in consideration of having placed, in his hands, or in the hands of another person, a demand of any kind, for the purpose of bringing an action thereon, or of representing the claimant in the pursuit of any civil remedy for the recovery thereof. * * *"

In support of her contention, the defendant cites and relies upon the case of In re Gilman's Administratrix (1929), 251 N.Y. 265, 167 N.E. 437. In that case, similar to the instant case, the attorney who was a party to a contingent fee agreement agreed to "bear all the necessary expenses." The Court held that such provision contravened the provisions of Section 274 and was a champertous agreement. The defendant asserts that the law of New York is applicable to the agreement and under that law the agreement is champertous and hence void and unenforceable. The plaintiff asserts that the law of Cuba is the applicable law and under that law the agreement is valid and enforceable. Those assertions bring up a conflict of laws question.

■ In this case jurisdiction is based upon diversity of citizenship and the applicable conflict of laws rule to be followed is that which is followed by the New York courts. Klaxon Co. v. Stentor Electric Manufacturing Co. (1941), 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed.2d 1477. The defendant asserts that the agreement having been executed in New York the New York law is applicable. The plaintiff asserts that while the agreement was executed in New York the center of gravity was in Cuba.

■ The more recent New York decisions bearing on the question here involved are the cases of Rubin v. Irving Trust Co. (1953), 305 N.Y. 288, 113

N.E.2d 424, and Haag v. Barnes (1961), 9 N.Y.2d 554, 175 N.E.2d 441, 216 N.Y. S.2d 65, 87 A.L.R.2d 1301. In the last case cited the Court stated (p. 68 N.Y.S. 2d, p. 443 N.E.2d):

> " * * * The more modern view is that 'the courts, instead of regarding as conclusive the parties' intention or the place of making or performance, lay emphasis rather upon the law of the place "which has the most significant contacts with the matter in dispute" '. See Auten v. Auten, 308 N.Y. 155, 160, 124 N.E.2d 99, 101, 50 A.L.R.2d 246; see, also, Rubin v. Irving Trust Co., 305 N.Y. 288, 305, 113 N.E.2d 424, 431. * * "

The case of Rubin v. Irving Trust Co., supra, involved the question of applicable law as to an oral agreement made in Florida under which a resident of New York agreed not to alter his will. The Court held that even though the agreement was made in Florida, yet since it related to a testamentary disposition in New York, the law of New York was applicable under the center of gravity theory. In the present case the contingent fee agreement was executed in New York. However, it related to the performance of legal services in Cuba in connection with a Cuban estate. It would seem that Cuba was the center of gravity as to that agreement. It is the view and holding of the Court that under the more recent New York decisions the courts of that State would hold that the law of Cuba was applicable on the question of the validity of the contingent fee agreement.

The plaintiff asserts that under the Cuban law the contingent fee agreement was valid and enforceable.

■ A former Judge of the Supreme Court of Cuba testified that under the Cuban Civil Code the agreement in question would not be champertous and unenforceable but would be valid and enforceable. He cited Article 1967 of the Cuban Civil Code as the authority for his opinion. That Article provides as follows:

"*ARTICLE 1967:* A statute of limitations of three years is provided for actions in order to recover the following obligations:

1. With relation to the payment to Judges, Attorneys, Registrars, Notaries, Clerks, Experts, Agents and Members of the Ecclesiastical Court of their fees and taxes as well as the expenses and disbursements which they might have incurred in carrying out their functions or duties in the matters relating to said obligations."

That Article on its face is a statute of limitations. It does not state that an agreement on the part of an attorney to pay the expenses of proposed litigation is proper. However, on matters of foreign law the opinion of a highly qualified witness should be given great weight. Therefore, this Court is of the view that the agreement in question would be a proper and valid agreement under the Cuban Civil Code.

The defendant contends that even though the agreement in question would be valid and enforceable under the law of Cuba, yet on grounds of public policy the New York courts would refuse to enforce it. Counsel have not cited any cases exactly in point as to whether the New York courts would or would not refuse to enforce a champertous agreement which was valid under the law of the jurisdiction in which it was to be performed.

■ Section 274 of the New York Penal Code invalidates champertous attorney fee agreements. That Section, which is a penal statute, is declaratory of the public policy of New York as to such agreements. An attorney fee agreement under which an attorney agrees to pay the expenses of the litigation is clearly inconsistent with and contrary to the public policy of New York. The Court is of the view that the New York Court of Appeals, when presented with the question, would hold that such an agreement would not be enforced by the New York courts even though, as in the present case, the agreement was valid between the parties under the law of the jurisdiction

which was the center of gravity of the agreement. However, since this Court has held, on other grounds, that the plaintiff cannot recover under the agreement, the question as to whether the Court of Appeals of New York would or would not deny enforcement is not determinative in this case.

The remaining issue between the parties is as to whether the plaintiff is entitled to recover in quantum meruit for the reasonable value of his services in connection with the Cuban litigation. Involved in that issue is the question of whether it is contrary to the public policy of New York to allow an attorney to recover in quantum meruit where he was employed under a contingent fee agreement which was illegal and unenforceable because of its champertous character. The law of New York has not been settled as to that question. In re Gilman's Administratrix (1929), 251 N. Y. 265, 167 N.E. 437. It therefore cannot be said with any certainty whether it is or is not contrary to the public policy of New York to allow an attorney to recover in quantum meruit where the contingent fee agreement under which he was employed is illegal and unenforceable because of its champertous character.

If it would not be contrary to the public policy of New York to allow an attorney employed under a champertous agreement to recover in quantum meruit for the reasonable value of his services, there would still be left for consideration the question as to whether the plaintiff is entitled to so recover in the present case.

In the present case the joint object and purpose of Mrs. Folla and the plaintiff in entering into their agreement was the sharing between them of the residuary property in the Cuban estate, the recovery of which was sought in litigation then under way. The recovery of that property was frustrated. If, as contended by the plaintiff, such recovery was frustrated by the actions of Mrs. Folla, then manifestly she would properly be held liable to him for the reasonable value of his services in connection with the litigation. However, as heretofore noted, the contention of the plaintiff that, except for the actions of Mrs. Folla, recovery of the residuary property in the Cuban estate would have been had lacks evidentiary support. The recovery of such property having been frustrated by subsequent events for which Mrs. Folla was not responsible, the question is whether she should be held liable for the reasonable value of the services rendered by the plaintiff in connection with the frustrated litigation.

In the present case to allow the plaintiff to recover in quantum meruit would be to hold that if recovery of the property had been had he was to share in it, but if recovery of the property was frustrated by subsequent events for which Mrs. Folla was not responsible he nevertheless was entitled to be paid the reasonable value of the services rendered by him in connection with the frustrated litigation.

There has been no showing by the plaintiff that either under the Cuban law or the New York law recovery in quantum meruit could be had in a situation similar to that in the present case.

It is the holding of the Court that the plaintiff may not recover in quantum meruit.

There is one other matter to be noted. It was and is the contention of the defendant that the plaintiff was incompetent to testify as to a number of matters under the provisions of New York's so-called dead man's statute. CPLR Sec. 4519. The challenged testimony was received subject to the defendant's objections.

The Court does not deem it necessary to rule on the validity of those objections for the reason that the evidence in this case, including the challenged evidence, does not entitle the plaintiff to recover herein.

The foregoing Memorandum constitutes the Findings of Fact herein by the Court.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter of this action and the parties thereto.

2. The defendant is not liable to the plaintiff on the contingent fee agreement of December 29, 1957.

3. The defendant is not liable to the plaintiff in quantum meruit for legal services rendered by him.

## ORDER FOR JUDGMENT

It is hereby ordered that judgment be entered adjudging and decreeing that the plaintiff recover nothing from the defendant herein and that his complaint be dismissed with prejudice and that final judgment be rendered in favor of the defendant herein.