Santiago Herminio **GONZALEZ Y BARREDO**, Appellant,

v.

Edelmira Folla **SCHENCK**, individually, and as Executrix of the Last Will and Testament of Maria Cintas Folla, Appellee.

No. 321, Docket 33496.

United States Court of Appeals, Second Circuit.

Argued March 5, 1970.

Decided June 24, 1970.

Harris L. Present, New York City (Arthur J. Galligan, Warren Belmar, and Dickstein, Shapiro & Galligan, New York City, of counsel), for appellant.

John Van Voorhis, New York City (Pollack & Singer, New York City, of counsel), for appellee.

Before LUMBARD, Chief Judge, ANDERSON, Circuit Judge, and DOOLING, District Judge.*

DOOLING, District Judge:

Plaintiff, a practicing lawyer in Havana, Cuba, now resident in the United States, sued on a contingent fee retainer agreement for twenty percent of a settlement in the amount of $1,100,000 and interest which the defendant executrix had received in 1962 for a release of all of the claims of her testatrix to share in the intestate property of her deceased brother Oscar Cintas, a national and resident of Cuba who died in Cuba on May 11, 1957. Alternatively plaintiff sued in *quantum meruit*.

The trial judge denied any recovery. He made elaborate and careful findings of fact incorporated in an opinion, 287 F.Supp. 505, and neither party quarrels with the findings of the underlying facts.

Oscar Cintas was at death a wealthy childless widower, and defendant's testatrix, Maria Folla, was his sister and his sole distributee under the law of Cuba as well as the law of New York. Cintas had made two wills, a Cuban will executed in 1953 and a New York will executed on April 30, 1957, very shortly before he returned to Cuba where he died on May 11, 1957. In neither was Maria Folla a legatee, but both wills were open to challenge and were challenged. Two clauses in the Cuban will—the "Tarafa" clause and the "unfortunate of Cuba" clause— were so uncertain in meaning that quite possibly Cintas died intestate as to the bulk of his Cuban estate, an intestacy embracing paintings in Cuba appraised later at more than $6,000,000 in value. The New York will was open, first, to a challenge to the validity of its execution and to the testamentary competency of

---

\* Of the Eastern District of New York, sitting by designation.

Cintas, and, second to a claim that the will, although validly executed in New York, had thereafter been effectively revoked by an intentional mutilation of its seal.

Maria Folla alone could benefit by an intestacy as to any of Cintas's property. She retained plaintiff to represent her in establishing a partial intestacy under the Cuban will, and she retained a New York lawyer to contend in the New York court that while Cintas's New York will had been validly executed it had been effectively revoked before his death.

The New York will specifically revoked the earlier Cuban will to the extent of the express dispositions of property made by the New York will; there was only one legatee in the New York will, a new corporation, Cuban Art Foundation, Inc., which was incorporated on the same day that the New York will was executed. To Cuban Art Foundation the will gave specifically described property which, most significantly, embraced art works (later appraised at over two million dollars) located in New York City, all bank deposits located in New York City and all shares of stock of Punta Allegre Sugar Corporation (a Delaware corporation), whether held by Cintas directly or indirectly, and all of the shares of stock that Cintas owned in Panamanian Securities, Inc. and in Mobilaria Cintas, S.A. The will provided that its testamentary dispositions should be construed and regulated by New York law, and former Decedent Estate Law, McKinney's Consol.Laws, c. 13, § 47 (now Estates, Powers and Trusts Law § 3–5.1(b), (h)) provided that "the validity and effect of such dispositions shall be determined by such laws." Cf. Matter of Clark, 1968, 21 N.Y.2d 478, 288 N.Y.S.2d 993, 236 N.E.2d 152. While the record does not disclose the property affected by the two wills (if both were effective except to the extent that the later New York will superseded the earlier one) it is agreed that, assuming the valid operation of the New York will, a great deal of property would still have been administered in Cuba as part of the Cuban estate, including the paintings located in Cuba.

The Chase Manhattan Bank was the Executor under the New York will. Cuban Art Foundation, Inc., the sole New York legatee, had as its purposes to receive and apply funds exclusively for educational purposes, and, specifically, to foster and encourage art within the Republic of Cuba and art created by Cubans, or persons of Cuban descent within or outside the Republic, and, in that connection, to solicit funds, receive legacies and otherwise acquire money and property, and to administer and apply it to acquire and maintain works of art, to lend funds or works of art or otherwise to assist organizations operating art museums located in Cuba and operated exclusively for educational purposes including any such museum that used Cintas's former residence in Cuba. The certificate of incorporation also provided that if Cuban conditions made it inadvisable to contribute funds or works of art to organizations in Cuba, then the corporation was to apply its funds to advance Cuban art elsewhere, and was to lend works of art on a temporary basis to other Western Hemisphere organizations operated exclusively for educational purposes. The corporation had the power to establish Cintas fellowships to encourage Cubans or their descendants to study art either in or outside the Republic. The Cuban Art Foundation was ruled by the United States Treasury Department to be tax exempt as an educational or charitable organization.

As the Court below found, plaintiff promptly initiated proceedings in Cuba to establish Maria Folla's status as the heir entitled to take the allegedly intestate property of Cintas. The proceedings continued in one or another form until the date in September 1961 when the plaintiff fled from Cuba to the United States. The Cuban proceedings did not establish an intestacy in favor of Maria Folla but her Cuban claim was still alive, in suit, and not finally adjudicated either for or against her when plaintiff left Cuba. As the Court below

found, there was little practical prospect that Maria Folla could have obtained a distribution from Cuba to her in the United States where she was a permanent resident (although still a national of Cuba), because of the political problems successively involved.

Plaintiff acted for Maria Folla first under a power of attorney and later, commencing in December 1957, under a contingent fee retainer agreement by the terms of which plaintiff agreed to pay any necessary expenses arising by reason of the Cuban suit and to furnish his professional services wherever necessary and as long as necessary "until" Maria Folla came into possession of the inheritance. Maria Folla agreed to pay 20% of the value of the property awarded to her calculated on the net value of the inheritance after deduction of Cuban and United States taxes, and after deducting the value of any works of art awarded to Maria Folla which she used for exhibition in museums in the United States or Cuba or the proceeds of which she devoted to charity.

In New York the Chase Manhattan presented the New York will for probate and it too became entangled in complicated litigation. The executor of the Cuban will, Vidana, intervened and attacked the New York will as invalidly executed and also presented the Cuban will for ancillary administration in New York, evidently planning to reduce the New York assets to possession and, presumably, then transfer them to Cuba. Another Cuban legatee—the legatee Tarafa named in the vague "Tarafa" clause—likewise intervened under a claim of heirship derived from the Tarafa clause in the Cuban will. Finally, Maria Folla objected to the probate of the New York will on the ground that while validly executed it had been revoked; she opposed ancillary administration of the Cuban will and advanced her claim to take the residue of the Cuban estate if that will was probated and the New York will held to be invalidly executed.

The result for which primarily Maria Folla contended in New York relied upon the concept that the New York will, if validly executed, effectively revoked the Cuban will so far as that will covered the same property, and that the later revocation of the originally valid New York will would not undo the revocation of the Cuban will but would produce an intestacy as to the property that had been named in the New York will. Maria Folla could thus claim as sole distributee under the laws of Cuba and New York.

The New York litigation, too, dragged on without any adjudications on the merits.

Apparently in the last part of 1959, and, certainly, by early 1960, negotiations were commenced to try to settle the whole matter. The parties to the negotiations were Folla, the Cuban Art Foundation, Chase Manhattan, Vidana, the Cuban legatee, Tarafa, and a special guardian for certain Cuban infant legatees. At no time did plaintiff participate in the negotiations. In February 1960, indeed, Maria Folla and her New York lawyer telephoned plaintiff, asked him to withdraw and inquired how much he would expect to receive to withdraw. The telephone conversation was apparently confused on Maria Folla's part and, on the part of her New York lawyer, was abusive of plaintiff, who was apparently expected forthwith to withdraw from the entire matter in favor of New York counsel and to settle out his fee. Plaintiff, stating that what he wanted was self-evident, declined discussion and then, as later, insisted that to take the conversation as signifying that his client was requesting him to discontinue proceedings in Cuba was senseless, since one does not start negotiations by discontinuing without consideration a part of the proceedings which, rightly or wrongly, might be regarded as important to the negotiator's legal position.

Plaintiff was neither informed of the progress of the negotiation nor of its

theory. Three executory agreements to settle were arrived at in the period September 29 through December 28, 1960. The first agreement (among Cuban Art Foundation, Maria Folla, Tarafa, a corporation named "foundation 'Succession of Oscar B. Cintas,'" Vidana and Edelman as special guardian for two infant legatees under the Cuban will) provided for the distribution of the New York estate, $500,000 to Maria Folla, $100,000 to Tarafa, and $150,000 to Vidana as representative of the Cuban estate and as representing the "unfortunate" (named in the vague clause in the Cuban will which Maria Folla challenged as invalid and productive of an intestacy); $15,000 was to be set up to secure payment to the two infant Cubans of their Cuban-will legacies; the entire remainder of the estate was to be distributed to Cuban Art Foundation; Maria Folla, Tarafa and Vidana withdraw their objections to the probate of the New York will, consented to its probate and agreed to deliver against payment of the specified sums general releases discharging the New York estate of all their claims; Foundation "Succession of Oscar B. Cintas" similarly withdrew its objections to probate and transferred its interest in the New York estate to Cuban Art Foundation and a similar agreement was made by the special guardian for the infant Cuban legatees. The *first* agreement was to take effect even if the Surrogate did not admit the will to probate and it recited that it was to be interpreted in accordance with New York law and to bind and inure to the successors and assigns of the parties; all parties agreed to execute any further documents necessary to effectuate the agreement. A *second* agreement dated October 24, 1960, between Maria Folla and the Cuban Art Foundation recited that the decedent left as part of his Cuban estate paintings and works of art located in Cuba and as part of the New York estate paintings and works of art located in New York and that Cuban Art Foundation wished to acquire the Cuban paintings and the works of art, giving as consideration an agreement to pay Maria Folla $600,000 to obtain from her a release of her rights and claims in the Cuban estate which, the agreement recited, Maria Folla was willing to do if the payment was secured by a first charge upon the interest of Cuban Art Foundation in the New York estate; the agreement then provided that Cuban Art Foundation assigned to Maria Folla a first charge on its right and interest in the property to which it was entitled from the New York estate to the extent of $600,000, and to execute any further instruments needed to give effect of the assignment; in exchange Maria Folla agreed to deliver a release of all of her interests in the Cuban estate and to execute any necessary further instruments to give effect to that release "and termination of any litigation which she has pending in Cuba with respect to the Cuban Estate"; the agreement was expressly subject to approval by the New York County Surrogate's Court. The *third* agreement (between Vidana and Cuban Art Foundation) recited Vidana's status as Executor of the Cuban will and as at least *soi disant* trustee for the vague provision for the unfortunate, recited the existence of paintings and works of art located in Cuba and the claim of Maria Folla that she represented the interests claimed by Vidana under the Cuban will and was entitled to the residuary property in Cuba, including the paintings, and "is asserting said claims in a plenary litigation pending in Havana"; the agreement then provided that Vidana transferred and assigned to Cuban Art Foundation all interest which he had in the paintings and works of art listed in the agreement; the agreement recited that the paintings and works of art had been delivered at the National Museum in Havana, Cuba, and that the Cuban Art Foundation by the agreement accepted delivery of the paintings at that Museum; in consideration of the transfer of the paintings and works of art the Foundation agreed to pay Maria

Folla $600,000 to obtain from her a renunciation of her interests in the Cuban Estate.

. Counsel for the Chase Manhattan testified that the bank's legal advisers considered Maria Folla's position in the Cuban estate a weaker one than that of Vidana, believing that the vague charitable provision for the unfortunate could be sustained, and that they settled the case in view of the strength of Maria Folla's position in the New York case, considering her position in the Cuban estate of no real moment. Counsel for Chase Manhattan testified that the transactions reflected in the set of 1960 agreements were valid, and valid in their use of Cuban Art Foundation, which was tax exempt, and that the three 1960 agreements were executed according to their terms, that the terms spoke for themselves, that they had been prepared, negotiated and executed under the supervision of Chase Manhattan's counsel, and that they were carried out according to their terms. The compromise agreement had to be submitted to the Surrogate's Court for its approval. Counsel for Chase Manhattan, in submitting the settlement for approval, made affidavit that Cuban Art Foundation had signed two agreements by which it was acquiring the paintings and art works in the Cuban estate, and, in consideration for the acquisition of the paintings, had agreed to get for the Cuban estate a release from Maria Folla of all the claims to the Cuban estate which she had been asserting in her plenary litigation in Cuba, including her claims to the paintings and the art works in Cuba; it was stated that the bank's counsel had been informed in Cuba by the other parties interested in the Cuban litigations that such a release by Maria Folla would facilitate settlement of the Cuban estate; it was stated further that by a second agreement Cuban Art Foundation obtained a release from Maria Folla by agreeing to assign to her to the extent of $600,000 a first charge on its residuary interest in the New York estate. Counsel for the bank averred in the affidavit that he found that he could not negotiate a settlement of the litigations pending in the probate proceeding on terms acceptable to Cuban Art Foundation (the sole legatee in the New York estate) without at the same time negotiating agreements to facilitate a settlement of the litigation with respect to the Cuban estate and that he had accomplished this by the two agreements which enabled Cuban Art Foundation to acquire Cintas's collection of paintings and works of art located in Cuba for exhibition in that country at a cost of $600,000, which was less than the appraised value of the paintings.

Counsel testified at the trial that these statements in the affidavits submitted to obtain approval of the compromise were truthful.

After the execution of the September 1960 agreements and under their terms the bank's counsel obtained a new Power of Attorney running to a different lawyer in Cuba from Maria Folla through her New York counsel, and the bank's counsel forwarded it to Vidana in Cuba so that he could effect the release of interest in the Cuban estate in pursuance of the compromise agreement.

The agreements were approved by the Surrogate's Court in February 1961, and the New York will was thereafter admitted to probate. A controversy of a kind not disclosed by the records arose and the transaction was not consummated until 1962, when the settlement agreement was finally carried out.

The intimation that the form of the transactions reflected in the documents was unreal and was intended only to produce some desired tax effect and that, in consequence, the transaction should be treated as a settlement of a controversy local to the New York estate for a consideration paid wholly from the New York estate will not withstand analysis. The tax problem was not articulated at the trial with particularity, but it appears to have turned on the fact that the stock of Punta Allegre Sugar Corporation (a good part if not most of the certificates of which were in Cuba

when Cintas died) was expressly bequeathed by the New York will and when Cintas died constituted one of the principal assets of his New York estate. However, the value of that stock had declined precipitously to about one-third of its estate tax valuation. It was testified at the trial that the tax effect of this was so great that, if Maria Folla had succeeded in becoming the sole taker of the New York estate, there would have been nothing after taxes left for her to take. The implication is that such a tax consequence counselled an all-round settlement that would preserve the charitable gift to Cuban Art Foundation and with it rescue distributable values that could be used to compromise the various claims to share in the estate.

It may be that it was thought wise that any direct Folla payment from the New York property be kept low and that the rest of the consideration for the global settlement be made by the tax-exempt Cuban Art Foundation as sole legatee of the estate after and out of the legacy paid to it in the New York distribution. Recognition of some validity in Maria Folla's Cuban claims may thus have furnished a vehicle to carry the compromise to completion. That, however, would not signify that the transactions were unreal; the motivation for choosing the transactions does not make them something other than what on their faces they profess to be. Whatever the motivation, and whatever the objective value of Maria Folla's Cuban claims, those claims were used as considerations to maximize estate values and to effect the settlement, and they were in fact surrendered as part of it. The "tax explanation" of the complex transaction thus amounts to saying that tax exigencies resulted in Maria Folla's being allowed in the settlement a substantial amount in respect of her claims to share in the Cuban estate. Tax considerations, indeed, appear to have played a significant part in the basic decision to compromise all claims rather than to litigate.

From the substantive point of view, then, there was a realization as part of the settlement upon the claims of Maria Folla to share in the Cuban estate.

The Court below rejected plaintiff's contentions that his legal efforts in Cuba and New York had affirmatively contributed to the making of the settlement in New York. The Court concluded that the money paid over to Maria Folla's executrix to consummate the settlement came from New York assets, and that New York counsel negotiated the transaction to plaintiff's exclusion. The Court below, that is, adverted only to the source of the payments and the conduct of the negotiations, and not at all to the nature of the claims compromised. The Court considered that Maria Folla had not prevented plaintiff from accomplishing a Cuban success but had, rather, arrived at total despair of success in the Cuban litigation, a despair that was a function of the fact the Cuban litigation had bogged down in a quagmire of entangled proceedings which the intervention of the Castro regime had, in any case, frustrated in ultimate objective, all quite independently of any "prevention" effected by Maria Folla's settling the litigation through New York counsel's efforts.

The question, however, was rather whether Maria Folla had made a settlement which realized something upon the claims committed to plaintiff's charge while plaintiff was still faithfully employed under the contingent fee arrangement. That question in turn depended on whether or not Maria Folla had terminated the attorney-client relation to the plaintiff before the settlement agreement was arrived at, and, if so, whether the termination was privileged or wrongful. The evidence does not support a conclusion that Maria Folla had terminated plaintiff's contract either by discharging him or by effectively committing herself to terminate the Cuban litigation so that abandonment of the Cuban litigation ended plaintiff's representation of his client. The incon-

clusive and bitter February 1960 exchange sought only to get plaintiff to step out of the case on a compromise of his fee, and the later correspondence in October and November 1960 between Maria Folla and plaintiff shows her, confused about her aims, trying to present the idea that she was tired of litigation and was settling it in New York. To this plaintiff's patient response was that if Maria Folla was bent on settling the litigation, then she should not gratuitously dismiss the Cuban litigation since that act was one of the considerations that she would give in compromise. The discussion was evidently not pressed beyond that point between lawyer and client, and the evidentiary inference is that plaintiff properly considered that his retainer and his role in the litigations (*qua* litigations) committed to his care remained intact, although subordinated to the settlement role entrusted to New York counsel. New York counsel found usable value in the Cuban claims, and, providentially, they were alive—and still committed to plaintiff's care under his contingent fee agreement and the power of attorney that had preceded it. The consciousness of the choice to use the Cuban claims as part of the settlement despite the plaintiff's known claim for compensation appears from the October 6, 1960, memorandum of the Chase Manhattan's lawyer that discusses the effect on the settlement that would follow upon elimination from the settlement of the proposal involving the Cuban estate; to do so would "eliminate the problem * * * with respect to the Cuban attorney * * * and leave him free to see what additional recovery he could obtain from the Cuban estate for the benefit of" Maria Folla.

■ Indeed were Maria Folla's letters of October 1960 treated as an effective dismissal of plaintiff, such a dismissal at the very time when a settlement utilizing the Cuban estate claims was being consummated would necessarily leave Maria Folla under a duty to compensate plaintiff. Cf. Matter of Tillman, 1932, 259 N.Y. 133, 135–136, 181 N.E. 75; Matter of Krooks, 1931, 257 N.Y. 329, 332–333, 178 N.E. 548.

■ The measure of recovery presents an evident problem. Plaintiff contended that he was entitled to 20% of the entire settlement, whether made with respect to claims in the New York or the Cuban estate, for he argued that the estate was an indivisible whole and that he was to receive 20% of the value of the property awarded to Maria Folla. The agreement with New York counsel read with similar breadth, but New York counsel related his entitlement to a percentage of the entire settlement to the fact that the entire consideration for the claims compromised was paid with funds derived from the New York estate. The nature of the Cuban estate claims and the fact that they had an independent validity even assuming the success of Maria Folla's position in the New York litigation, must induce the conclusion that a reasonable interpretation of plaintiff's agreement would set as a ceiling upon his recovery the amount that Maria Folla realized on the Cuban estate claims which plaintiff was litigating on her behalf. It does not follow that plaintiff would be entitled to 20% of the $600,000 and interest received under the 1960 agreements. Plaintiff's client had excluded him from participation in the settlement negotiation, a critically important and difficult phase of the lawyer's manifold of tasks under a plenary retainer. That exclusion precluded the plaintiff from fully performing and recovering upon his contract, but, since the exclusion was not based on plaintiff's fault or misconduct, his client remained liable in *quantum meruit* for the benefit and advantage derived in the settlement through the use of the Cuban estate claims that plaintiff's legal efforts had kept alive as well as for any direct value his legal advice and opinions contributed to the New York phases of the litigation. Cf. Crowley v. Wolf, 1939, 281 N.Y. 59, 65–66, 22 N.E.2d 234; Matter of Krooks, *supra*, 257 N.Y. at 332, 178 N.E. 548; Matter

of Snyder, 1907, 190 N.Y. 66, 70, 82 N. E. 742. The record indicates that complex calculations controlled the allocation of dollar amounts between payment sources and not any simple $600,000–$500,000 distribution of basal compromise values between the Cuban and New York estates. An evaluation of what bringing the Cuban estate into the settlement contributed to what Maria Folla received overall is required and the record does not furnish it. The matter will have to be investigated upon remand.

Plaintiff argued for a *quantum meruit* recovery and presented rather artificial testimony that plaintiff's services were worth $200,000 and more. The defendant contended that plaintiff had persistently presented theories of law which were incorrect and which, if presented to the New York Court, would have been disastrous. The argument of defendant is that Maria Folla could succeed only by showing first that the New York will had been validly executed and second that it had been effectively revoked; that this precise sequence would (because of the operation of former Decedent Estate Law Section 47) have the effect of producing a Cuban will intestacy as to the property described in the New York will, the further effect of making all of the property described in the New York will New York assets to be administered in the New York Surrogate's Court, and the final effect, through the revocation, of removing Cuban Art Foundation as legatee in favor of Maria Folla as intestate taker of the entire New York estate.

Plaintiff, on the other hand, argued —or warned?—that, since Oscar Cintas was a Cuban national and resident and had died in Cuba, and, since Maria Folla was a Cuban national (although a permanent resident in New York) her status as intestate heiress and her rights necessarily turned upon the extent of the intestacy occurring under the Cuban will and her status in Cuba under and independently of the Cuban will. That position led plaintiff to argue that the New York will, if it was validly revoked *after* an execution valid under both laws and which—therefore—would be effective to revoke the Cuban will *pro tanto*, was nevertheless not a valid revocation under Cuban law because mutilation of the seal would not, under Cuban law, have sufficed to revoke the will: that consequence would oust Maria Folla from sharing in the New York assets. Cf. Matter of Traversi, 1946, 189 Misc. 251, 64 N.Y.S.2d 453. At various times, therefore, plaintiff had suggested administration of the entire estate as an undivided whole in Cuba and relying on the Cuban intestacy alone.

The case for rejecting plaintiff's views as wrongheaded and adverse to a plainly right New York law view of Folla's rights is not the simple one that defendant assumes. There was a risk (however small) that the short-lived New York will would be found to have been invalidly executed in spite of the impressiveness of the witnesses to it: Cintas was suffering from terminal cancer, returned to Cuba but to die, and is portrayed as intentionally revoking a will on which the ink was scarcely dry. On the issue of effective revocation of a validly executed will, the record does not indicate where and when Cintas mutilated the seal. Cf. Matter of Traversi, *supra*. While the former Decedent Estate Law, Section 47, is literally clear that the "testamentary dispositions" of a Section 47 will are to be determined by New York law, Folla's contention was— it had to be—that the "testamentary dispositions" of the New York will had never taken effect, that the will had been revoked, and that its making and revocation, as private acts, were governed by New York law and yet operated to create an intestacy through partial revocation that New York's court would hold effective no matter what the Cuban law. Cf. Matter of Clark, supra; Matter of Traversi; contrast language of former Section 47 with present Section 3–5.1(h). Yet arguably, if Folla was right, the New York will would never take effect as a will and there would be

no "New York estate" or anything but a partial Cuban will intestacy plus the presence in New York of assets of a deceased foreign testator justifying only a local administration ancillary to a main Cuban administration. It could not be clear that Cuban views of the legal effect of a Cuban domiciliary's acts on his Cuban will and its partial revocation could safely be ignored; and, when the estate was opened it appeared that the certificates for a very large part of the Punta Allegre Sugar Corporation stock were located physically in a bank in Cuba—and there was much other property in Cuba.

The more significant point however, may be, as the Court below found, that plaintiff evidently believed at the time —and still believed at trial time—that the opinions that he had given were correct. Again, and again more significant than the abstract validity of plaintiff's views, plaintiff did not, as he had at one point suggested might be done, seek in Cuba to invalidate the New York will. Plaintiff at no time acted adversely to the interest of his client in his own interest, or in the service of his own views on the law, but acquiesced in the positions adopted by the New York lawyers so far as related to the New York will.

In any case, plaintiff's views on Cuban law were at an early stage in the New York litigation adopted by Maria Folla to challenge the position in the New York litigation of the other Cuban claimants as proponents of the Cuban will for ancillary administration in New York; plaintiff's view was used also to support the proposition that should the New York will be denied probate in New York, then Maria Folla would by virtue of her Cuban heirship be entitled to original Letters of Administration in New York with respect to all of the decedent's property located in New York. A little later plaintiff's views of the effect of the Cuban decisions in the Cuban litigation were evidently used to meet contentions advanced by the Cuban intervenors in the New York matter. Similarly in the answer to the Petitions to Probate the two wills, that of 1957

and that of 1953, the position taken concerning Maria Folla's rights with respect to the Cuban will of 1953 was that which plaintiff contended for in support of Maria Folla's claims throughout, that is, that both the Tarafa provision and the provision for the unfortunate of Cuba were ineffective as legacies, charitable or otherwise, and resulted in a partial intestacy under which Maria Folla succeeded.

■ Hence, on a *quantum meruit* basis it is not possible to say that no affirmative contribution to the New York litigation was made by plaintiff. Plaintiff did not participate in the critical negotiations that produced the settlement, nor can it be suggested that he had a significant role in the New York litigation. Rather, he contributed something of value to it, and the final result, as in any case, reflects in some degree all that brought the case to its final resolution.

The task of determining, on remand, the amount due plaintiff includes, then, determining the contribution to the ultimate settlement amount made through the inclusion in it of the Cuban estate matter, and the value of plaintiff's Cuban law contributions to the total of work in the New York estate litigation which led ultimately to the settlement agreement.

The Court below disposed of a number of objections to the allowance of compensation to the plaintiff related to the terms and circumstances in which the contingent fee arrangement was made, and, as to these matters, and the matter of whether anything that plaintiff did constituted unauthorized practice of the law in New York, the Court below was plainly correct and the points do not require or merit further discussion.

■ The Court below rejected the contention that plaintiff's contingent fee arrangement was invalid because under it plaintiff undertook to "pay any necessary expenses" arising by reason of the proposed Cuban suit; the Court concluded that the agreement was legal and val-

id in Cuba, where the litigation to which it related was expected to be prosecuted, and that despite its execution in New York City, under New York rules of the conflict of laws, the validity of the agreement would in general have been governed by the law of Cuba. The Court, however, considered that New York public policy, as expressed in Section 274 of the former Penal Law of New York, McKinney's Consol. Laws, c. 40 (now Judiciary Law McKinney's Consol. Laws, c. 30, § 488, subdivision 2), would not countenance enforcement of the agreement by a New York court despite its validity as between the parties under the law of the jurisdiction which was, for conflict of laws purposes, the "center of gravity" jurisdiction. It may be that the New York courts would decline affirmative enforcement to the offending portion of the contingent fee agreement; for example, they might reject a suit by Maria Folla to compel the lawyer to advance expenses. But there is no indication in the cases that when compensation is sought after the legal services have been rendered at the place where it was lawful for the plaintiff to act under the agreement in the expectation of payment, that the New York Courts would decline to enforce the compensatory aspect of the agreement by denying all recovery. The contract did not call for the rendering of illegal services. See Oltarsh v. Aetna Life Ins. Co., 1965, 15 N.Y.2d 111, 256 N.Y.S.2d 577, 204 N.E.2d 622; Intercontinental Hotels Corp. v. Golden, 1964, 15 N.Y.2d 9, 254 N.Y.S.2d 527, 203 N.E.2d 210. In any case the public policy approach does not under New York law, or the law generally, extend to denying an alternative recovery in *quantum meruit*. McCoy v. Gas Engine & Power Co., 2d Dept. 1912, 152 App.Div. 642, 137 N.Y.S. 591, aff'd, 1913, 208 N.Y. 631, 102 N.E. 1106; Application of Kamerman, 2d Cir. 1960, 278 F.2d 411; Annotation, 1965, 100 A.L.R.2d 1378.

Accordingly, the judgment is reversed and the case remanded to the district court to determine the amount of compensation due to plaintiff.